UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMADOU DIA,

     Petitioner,

                                  Case No. 1:26-cv-1054

v.

                                  Hon. Hala Y. Jarbou

KEVIN RAYCRAFT and
MARKWAYNE MULLIN,

     Respondents.

_____/

## **OPINION**

On April 14, this Court entered a temporary restraining order prohibiting Respondents, the director of the Detroit field office of US Immigration and Customs Enforcement (ICE) and the acting secretary of the Department of Homeland Security (DHS), from removing Petitioner Amadou Dia to Ghana or any other country not named in his final order of removal until Dia is given an opportunity to argue to an immigration judge that he would be tortured or persecuted if deported to that country. (ECF No. 15.) The Court also ordered Respondents to show cause why the TRO should not be converted to a preliminary injunction. Before the Court is Respondents' brief opposing conversion, as well as Dia's reply in support. For the reasons set out below, the Court will enter a preliminary injunction preserving Dia's right to assert fear-based claims before an immigration judge while this litigation is pending.

## I.      BACKGROUND

Amadou Dia is a Senegalese national admitted to the United States on a nonimmigrant visa in 2006. (Resp. to Pet. 2, ECF No. 4.) In 2007, Dia applied for asylum or withholding of removal. (*Id.*) His application was referred to an immigration judge, who in 2012 denied the asylum petition

and ordered Dia's removal to Senegal or Gabon but granted him withholding of removal from Senegal. (*Id.*)  No attempt to enforce the removal order appears to have been made until September 17, 2025, when Dia was detained without bond in anticipation of his removal to Gabon.  (*Id.*; Mot. for TRO 1, ECF No. 7.)  Gabon refused to issue travel documents for Dia, so ICE began exploring other countries to remove Dia to.  (Resp. to Pet. 3.)  On March 25, 2026, ICE was informed that the Republic of Ghana would accept Dia without a travel document and that the Ghanaian government had assured the United States that noncitizens removed to its jurisdiction would not be persecuted or tortured.  (Resp. to Pet. 4.)  The parties agree that pursuant to a March 2025 guidance document issued by DHS (*see* Memorandum from Kristi Noem, Sec'y of Homeland Sec. (Mar. 30, 2025), ECF No. 9-1 ("March Guidance")), Dia has not been afforded the opportunity to assert that he would be persecuted or tortured if removed to Ghana.  (*See* Reply in Supp. of TRO 2–3, ECF No. 13; Suppl. Resp. to Mot. for TRO 4, ECF No. 14.)

On March 30, 2026, Dia filed a petition for habeas corpus with this Court seeking his immediate release from detention on the ground that his removal is not reasonably foreseeable. On April 6, he sought a temporary restraining order to prevent his imminent removal to Ghana on the ground that such a removal would be inconsistent with section 241 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1231, as well as the regulations giving domestic effect to the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), *opened for signature* Feb. 4, 1985, 1465 U.N.T.S. 85.  The Court entered the TRO and ordered the parties to submit additional briefing on whether the TRO should be converted to a preliminary injunction.

## II.    LEGAL STANDARD

Preliminary relief is an exceptional remedy that a court may grant only when it is necessary to preserve the status quo before a full adjudication on the merits.  The four considerations that

guide the decision to enter a preliminary injunction are the likelihood that the movant will succeed on the merits of their claims, the risk that the movant will be irreparably harmed absent an injunction, the balance of the equities between the movant and the nonmovant, and the effect of an injunction on the public interest. *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024). "In constitutional cases, the first factor is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

### III.    ANALYSIS

The government offers three grounds for dissolving the TRO and allowing Dia's removal to go forward. *First*, it contends this Court lacks jurisdiction over Dia's claims. *Second*, it argues the case should be transferred to the District of Massachusetts because Dia's claims fall within the scope of the relief he was granted as a member of the class certified in *D.V.D. v. U.S. Department of Homeland Security*, No. CV 25-10676, 2026 WL 521557 (D. Mass. Feb. 25, 2026). *Third*, it avers that Dia's claims fail on the merits because neither the INA nor the CAT nor the Constitution dictate that Dia be afforded the opportunity to raise fear-based claims before his removal to a third country.[1]  These arguments do not significantly differ from those offered in opposition to Dia's TRO application, but the Court has reevaluated them in light of the parties' more fulsome briefing in the interim. The Court remains unpersuaded by the government's objections, so it will convert the TRO into a preliminary injunction.

### A.    Jurisdiction

The Court begins, as it must, by assuring itself of its jurisdiction. *See In re 2016 Primary Election*, 836 F.3d 584, 587 (6th Cir. 2016). The government renews its argument that the

---

[1] Removal to a country not listed in a final order of removal is commonly referred to as third-country removal, since the removal order must "identify a country, or countries in the alternative, to which the alien's removal may in the first instance be made." 8 C.F.R. § 1240.12(d). If DHS is "unable" to remove the noncitizen to one of those countries, it can attempt to remove the noncitizen to another country. *Id.*

jurisdiction-stripping provisions in the INA deprive this Court of the authority to entertain Dia's procedural claim.  The Court once more finds that the INA erects no such bar.

The relevant provisions are subsections (a)(5), (b)(9), and (g) of 8 U.S.C. § 1252. Subsections (a)(5) and (b)(9) together render a petition for a court of appeals to review a final order of removal the "sole and exclusive means," *id.* § 1252(a)(5), of obtaining a judicial pronouncement on such an order or on "any action taken or proceeding brought to remove an alien from the United States," *id.* § 1252(b)(9).  Subsection (g) reinforces subsections (a)(5) and (b)(9) by expressly prohibiting courts from hearing claims arising from the "decision or action . . . to commence proceedings, adjudicate cases, or execute removal orders against any alien" except as provided in § 1252.

Nothing in § 1252 guarantees that every immigration-related issue may be reviewed through the scheme established by subsections (a)(5) and (b)(9).  Section 1252(g) in particular is susceptible of a reading that would foreclose any review of the commencement, adjudication, or execution of removal proceedings if the relevant actions or decisions could not be raised in a petition for review by the appropriate court of appeals.   Nevertheless, the Court concludes that subsection (g), properly interpreted, does not prevent this Court from entertaining Dia's claims.

Start with the text.  The ordinary meaning of the phrase "execute removal orders" would seem to exclude from its coverage removal to a country *not* mentioned in the order.  To "execute" means to "do what is provided or required by" something.[2]  Although Dia's removal is "required by" the final order, his expulsion *to Ghana* is not.  Additionally, Dia expressly disclaims any challenge to the validity of the removal order or DHS's authority to remove him.  His sole grievance is the agency's failure to provide him with any sort of process for raising fear-based

---

[2] "Execute," Merriam-Webster, https://www.merriam-webster.com/dictionary/execute [https://perma.cc/7KHX-N926].

claims in response to the government's designation of Ghana as his country of removal.  As a textual matter, then, § 1252(g) does not clearly preclude this Court from adjudicating Dia's claims.

Judicial interpretation of subsection (g) confirms what its text suggests.  The Supreme Court has only had occasion to pronounce on the subsection's meaning in one case, *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999).  The *AADC* Court, speaking through Justice Scalia, held that subsection (g) barred federal courts from addressing collateral challenges to the commencement of immigration proceedings except insofar as those challenges could be brought through the channel established by subsections (a)(5) and (b)(9).  *Id.* at 487.  On the way to that conclusion, the Court emphasized the narrowness of subsection (g)'s scope: the mischief subsection (g) was "specifically directed at" was the "deconstruction, fragmentation, and hence prolongation of removal proceedings," *id.*, caused by prior judicial practice allowing for nonstatutory review of the government's exercise of its "discretion to abandon" immigration proceedings on humanitarian or other grounds, such as the practice known as deferred action, *id.* at 483–84.[3]  The Court explained that the three actions specified in § 1252(g)—commencing actions, adjudicating cases, executing removal orders—were not a "shorthand way of referring to all claims arising from deportation proceedings," *id.* at 482, and were instead singled out to emphasize that the "specified decisions and actions . . . *are* covered by the 'zipper' clause of § 1252(b)(9)," *id.* at 483.  The *AADC* Court made clear that numerous actions also involved in the carrying out of removal, such as the decision "to include various provisions in the final order that is the product of the adjudication," are not thereby decisions "arising from" the three actions listed in subsection (g).  *Id.* at 482.  The Court cited this narrow interpretation of the subsection with

---

[3] *See* 1 U.S. Citizenship & Immigr. Servs, USCIS Policy Manual pt. I, ch. 3, https://www.uscis.gov/policy-manual/volume-1-part-i-chapter-3 [https://perma.cc/D9SA-GFGB]; U.S. Citizenship & Immigr. Servs, PA-2026-01, Deferred Action as an Extraordinary Use of Prosecutorial Discretion (2026), https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20260508-DeferredAction.pdf [https://perma.cc/W544-D97Z].

approval nearly two decades later in a case evaluating the meaning of the same "arising from" language in § 1252(b)(9).  *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018).

*AADC*'s interpretation of subsection (g)'s purpose as a discretion-protecting provision dovetails with the ordinary meaning of the provision's text.  The decision to execute a removal order is quintessentially discretionary—one that the executive branch has frequently declined to take in order to prevent harsh outcomes for certain classes of noncitizens.[4]  Subsection (g) ensures that the government's choice to enforce a final, valid removal order is not frustrated by claims challenging the government's refusal to exercise its discretion in favor of a particular noncitizen. Text and purpose point to the same result: subsection (g) strips the courts of jurisdiction over claims arising from the decision, wholly committed by statute to the executive's discretion, to remove a noncitizen from this country.  But the provision erects no barrier to the consideration of claims that challenge the government's failure to go through a process contended to be necessary before the order of removal can validly be executed.

This Court is not alone in regarding claims challenging removal to a third country as beyond the scope of § 1252(g)'s jurisdictional bar.  In addition to the *D.V.D.* class action (about which more below), numerous district courts, and at least one court of appeals, have rejected the jurisdictional arguments advanced by the government.  *See, e.g.*, *Beltran v. Everglades Detention Facility*, No. 2:26-cv-1228, 2026 WL 1223583, at *1–2 (M.D. Fla. May 5, 2026); *Guerra v. Blanche*, No. 2:26-cv-498, 2026 WL 949027, at *2–3 (D. Nev. Apr. 7, 2026) (citing *Ibarra-Perez v. United States*, 154 F.4th 989, 996 (9th Cir. 2025)); *Wen Jun Liu v. Noem*, No. 5:26-cv-891, 2026 WL 712952, at *2 n.2 (C.D. Cal. Mar. 10, 2026); *Romero v. Ladwig*, No. CV 25-1106, 2026 WL

---

[4] The most well-known example being the Deferred Action for Childhood Arrivals policy initiated during the Obama administration. *See Consideration of Deferred Action for Childhood Arrivals (DACA)*, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/DACA [https://perma.cc/UDS5-BUZB].

685131, at *1–2 (M.D. La. Mar. 10, 2026); *Mbaba v. Perez*, No. 5:26-cv-70, 2026 WL 917484, at *5 (S.D. Tex. Feb. 13, 2026); *Portela-Hernandez v. Trump*, No. 25-1633, 2026 WL 74042, at *4–5 (D. Md. Jan. 9, 2026); *see also Herrera-Juarez v. Blanche*, No. 26-1440, 2026 WL 1147182 (4th Cir. Apr. 28, 2026) (order granting stay of removal).

The government insists that the Sixth Circuit's decision in *Hamama v. Adducci*, as well as similar decisions barring collateral challenges to the execution of removal orders, compels dismissal. *See* 912 F.3d 869, 874 (6th Cir. 2018); *Rauda v. Jennings*, 55 F.4th 773, 778 (9th Cir. 2022); *Camarena v. Dir., ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021). These cases are not on point, because none of them squarely addresses whether removal to a third country not specified in the final order of removal constitutes "execution" of that order. As noted in the Court's TRO opinion, *Hamama* involved a challenge to removal to the country specified in the removal order based on changed country conditions. The noncitizen in *Rauda* advanced a similar argument based on new threats allegedly made to him by gang members in the country named in his removal order. *See* 55 F.4th at 776. And the country of removal was not mentioned at all in the *Camarena* case.

*Camarena*'s concern about the "sleight of hand" of dressing up attacks on the "*execution* of a removal order*" as attacks on "the government's *authority*" to execute the order is a valid one. *See* 988 F.3d at 1274. But that concern is inapplicable here because Dia challenges neither the execution of his removal order nor the government's authority to execute it. What he challenges is the government's authority to remove him to a country not named in his removal order at all. That challenge is not placed outside this Court's jurisdiction by subsection (g). Dia's case is more akin to *Madu v. U.S. Attorney General*, 470 F.3d 1362 (11th Cir. 2006), distinguished by *Camarena* on the ground that the challenge there asserted the absence of a removal order altogether. *See Camarena*, 988 F.3d at 1273. Dia's claim is premised on the absence *of Ghana*

7

from his removal order and the failure of the government to provide him a meaningful opportunity to contend that he would likely be tortured or persecuted if sent to that country.

Similar considerations explain why § 1252(a)(5) and (b)(9) do not block Dia's claims either.  As noted earlier, subsections (a)(5) and (b)(9) channel judicial review of immigration proceedings and the issues arising from them into one consolidated petition for review of a final removal order by an appeals court.  This statutory review scheme does not encompass claims arising from government conduct *after* entry of a removal order or unrelated to it, such as to a noncitizen's unlawful detention pending removal, *see Zadvydas v. Davis*, 533 U.S. 678 (2001). The government's argument that Dia should present his claim to a court of appeals would be more persuasive if it could articulate a path for Dia to do so.  But the suggestions that Dia can move to reopen proceedings or that he should have sought withholding from Ghana during the pendency of his removal proceedings are implausible.  The Executive Office of Immigration Review (EOIR) regulations governing the reopening of immigration-court proceedings bar Dia from seeking to reopen proceedings that terminated over a decade ago.  *See* 8 C.F.R. § 1003.23(b)(1) (2026).  And Dia cannot be blamed for failing to predict that the government would seek to remove him to a country to which he has no connection.  As the *D.V.D.* court noted, the "practical difficulty" of raising fear-based claims about a country to which the noncitizen has no reason to think they will be removed in the future is compounded by the apparent impossibility of obtaining withholding of removal under the INA or the CAT from a country that is not the "proposed country of removal." 2026 WL 521557, at *13–14 (quoting 8 C.F.R. § 1208.16(b) (2026)).  Because there is no apparent avenue for Dia to seek withholding of removal to Ghana from DHS, there is no reason to mandate that he challenge the government's refusal to allow him to seek withholding in an appeals court.

Accordingly, subsections (a)(5) and (b)(9) do not prevent this Court from entertaining Dia's challenge.

The government's last jurisdictional argument is easily disposed of.  Section 2242(d) of the Foreign Affairs Reform and Restructuring Act (FARRA) of 1998, Pub. L. No. 105-277, div. G, § 2242 (codified at 8 U.S.C. § 1231 note), accomplishes two distinct tasks: it bars review of the regulations implementing section 2242 (which in turn give domestic effect to the United States' treaty obligations under the CAT), and it clarifies that section 2242 should not be construed as establishing a separate jurisdictional basis for courts to review CAT claims other than through the INA's statutory review scheme.  But Dia is not raising a CAT claim before this Court and he is not challenging a FARRA regulation.  He argues, as part of a habeas proceeding, that DHS has not afforded him an adequate opportunity to raise a CAT claim before DHS.  Section 2242(d) does not bar habeas actions challenging the denial of adequate process in the adjudication of CAT claims. *See Saint Fort v. Ashcroft*, 329 F.3d 191, 201–02 (1st Cir. 2003), *cited in D.V.D.*, 2026 WL 521557, at \*18; *Auguste v. Ridge*, 395 F.3d 123, 138 n.13 (3d Cir. 2005).

In sum, the Court again finds that it has jurisdiction to hear Dia's procedural claim.  The most plausible bar, § 1252(g), does not apply here because Dia's challenge is not to the execution of his removal order but to his removal to a country *not* named in his removal order without allowing him to seek withholding under the INA or the CAT.  The statutory review scheme set out in § 1252(a)(5) and (b)(9) does not channel Dia's claims into a petition for review by a court of appeals because there is no evident path for those claims to be asserted in such a petition.  And FARRA's bar does not apply.  This Court may reach the merits of Dia's claims.

## B.  *D.V.D. v. DHS*

The government renews its argument that the Court should decline to grant Dia preliminary relief in deference to the final relief entered in the *D.V.D.* class action in favor of Dia and other

members of the class.  The government frames its request as a matter of this Court extending "comity" to the *D.V.D.* court (Suppl. Resp. to Mot for TRO 20, ECF No. 17), but its arguments mostly turn on the impropriety of granting relief purportedly rejected by the First Circuit, which stayed the *D.V.D.* final judgment pending appeal, and the Supreme Court, which stayed the preliminary injunction the *D.V.D.* court entered last year, *see DHS v. D.V.D.*, 145 S. Ct. 2153 (2025).  The government's arguments for transfer or abstention do not meaningfully differ from those it presented in opposition to Dia's TRO application, and it has not shown why transferring this case to a court that has entered a final judgment would be appropriate.  The sole case cited in the government's brief does not account for the stay of the *D.V.D.* final judgment, so its remedial analysis is unpersuasive.  *See Azarnezhad v. Bondi*, No. 26-3073, 2026 WL 1004519, at *3 (D. Kan. Apr. 14, 2026).  By contrast, many district courts have addressed claims like Dia's since the *D.V.D.* judgment was entered without evident concern that doing so encroached on the *D.V.D.* court's jurisdiction.  *See, e.g.*, *Quezada Pacheco v. Baltazar*, No. 26-cv-1176, 2026 WL 1223414, at *4 (D. Colo. May 5, 2026); *Kamleshan, v. Blanche*, No. 2:26-cv-908, 2026 WL 1194600, at *9 (W.D. Wash. May 1, 2026); *Mendoza Palacios v. Mullin*, No. 26-cv-648, 2026 WL 933319, at *4 (D. Md. Apr. 7, 2026); *Rivas Quijada v. Semaia*, No. 5:26-cv-1540, 2026 WL 1182196, at *3 (C.D. Cal. Apr. 20, 2026).  Transfer now would be tantamount to denying Dia relief without adjudicating his entitlement to it.  In the absence of authority mandating that result, this Court will not dispose of Dia's claims in that manner.  The Court now turns to the merits.

**C.     Merits**

This Court found that Dia was likely to succeed on the merits of his claims when it granted his TRO application.  It will now explain more precisely why that is so.

The heart of Dia's challenge is that the government may not remove him to a third country unless it gives him the opportunity to assert that he would be tortured or persecuted if sent to that

country.   The bedrock on which this argument rests is 8 U.S.C. § 1231, which specifies the countries to which a removable noncitizen may be sent, *id.* § 1231(b)(1)–(2), and prohibits removal "to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1231(b)(3)(A).[5]  Equally pertinent to Dia's challenge are the regulations implementing the United States' CAT obligations, which mandate that a noncitizen entitled to protection under the CAT "shall be granted withholding of removal" to a country that is likely to torture him.   8 C.F.R. § 1208.16(c)(4) (2026); *see also id.* § 208.16(d)(1) (directing DHS adjudicators to "grant[]" an "application for withholding of deportation or removal to a country of proposed removal . . . if the applicant's eligibility for withholding is established"). According to Dia, these sources of law bar ICE from removing him to Ghana unless he is given a meaningful opportunity to request withholding of removal under the INA or the CAT.  The denial of these statutory rights, Dia further contends, amounts to a deprivation of the due process guaranteed by the Fifth Amendment.  The government, for its part, denies that the cited enactments mandate any particular process for allowing noncitizens to raise fear-based claims, and it argues that the procedure specified in the March Guidance clears the threshold laid down by the Fifth Amendment.  The Court concludes that Dia is likely to prevail on both statutory and constitutional grounds.

*Section 1231.*  On its face, § 1231(b)(3)(A) only prohibits a noncitizen's removal if DHS "decides" that the noncitizen would be persecuted.  Nothing in subsection (b)(3)(A) explicitly dictates how DHS reaches that decision, or even imposes on DHS an obligation to reach such a

---

[5] The statute's reference to the attorney general should probably be understood as referring to the secretary of DHS, in accordance with the transfer of all responsibility for detention and removal to DHS. *See* 6 U.S.C. §§ 251(2), 552(d); 8 U.S.C. § 1551 note (Abolition of Immigration and Naturalization Service and Transfer of Functions); *see also Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) (discussing reallocation of removal enforcement authority to DHS).

decision at all.  A later subsection directing "the trier of fact" to "determine whether the alien has

sustained the alien's burden of proof" for demonstrating a threat to their life or freedom indicates

that Congress assumed the existence of a process for noncitizens to seek withholding of removal,

but it too does not expressly obligate DHS to decide on a noncitizen's entitlement to withholding.

*See id.* § 1231(b)(3)(C).

That obligation is grounded in the statute's purpose, as inferred from its text and context.

Subsection (b)(3) clearly aims to ensure that noncitizens will not be removed to countries where

their "life or freedom would be threatened." *Id.* § 1231(b)(3)(A).  That purpose would be frustrated

if DHS could simply refuse to evaluate the risk posed to a noncitizen before removing them to a

third country.  *See* Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal

Texts 63–65 (2012) (discussing the presumption against ineffectiveness); 2A Norman J. Singer &

Shambie Singer, Sutherland Statutes and Statutory Construction § 45:12 (7th ed.) (discussing the

"reasonable result" doctrine).

The history of § 1231(b)(3)(A) confirms its purpose.  The predecessor to that subsection

was enacted as part of the Refugee Act of 1980, Pub. L. No. 96-212, sec. 203(e), § 243(h), 94 Stat.

102, 107.  The Refugee Act gave domestic effect to the 1951 United Nations Convention Relating

to the Status of Refugees (the "Refugee Convention"), which the government acceded to by

ratifying the 1967 Protocol Relating to the Status of Refugees.  *See* S. Rep. No. 96-590, at 20

(1980) (Conf. Rep.) (noting that the Refugee Act "is based directly upon the language of the

Protocol and it is intended that the provision be construed consistent with the Protocol").  The

Refugee Convention prohibits signatories from refouling—that is, returning—refugees to

territories in which their "life or freedom would be threatened on account of [their] race, religion,

nationality, membership of a particular social group or political opinion."  Refugee Convention

art. 33, T.I.A.S. No. 6577 (July 28, 1951).  The current section 1231(b)(3)(A) contains language nearly identical to that found in the Convention.  The Convention's clear prohibition on refoulement, mirrored in subsection (b)(3)(A), counsels against an interpretation of the statute that would allow DHS to avoid deciding whether removal would lead to such an outcome.

Lastly, subsection (b)(3)(A)'s purpose can be inferred from an earlier version that it replaced, which merely "authorized" the Attorney General to withhold a noncitizen's deportation if the noncitizen would in the Attorney General's "opinion" be physically persecuted in the country of deportation.[6]  Congress substituted this discretionary authorization with a mandatory prohibition on removing noncitizens to countries where their life or freedom would be threatened, if DHS decides such a threat exists.  Taken together, these indicia of subsection (b)(3)(A)'s purpose justify reading the provision to mandate that DHS make a decision on a noncitizen's claim that he is entitled to withholding of removal.

The government argues that the March Guidance sets up an adequate mechanism for making that decision.  (Gov't's Resp. 25–26.)  But under that guidance, DHS has no obligation to consider whether persecution or torture is likely upon removal to a third country where the government has received "diplomatic assurances" from that country that noncitizens "removed from the United States will not be persecuted or tortured."  (*See* March Guidance 1.)  If the State Department believes those assurances are "credible," a noncitizen may be removed to that country "without the need for further procedures."  (*Id.* at 2.)

Such a process does not fit with § 1231, which expressly ties DHS's decision to the "life or freedom" of "*the* alien" to be removed, not to the life or freedom of noncitizens generally.  *See*

---

[6] Note, *Protecting Deportable Aliens from Physical Persecution: Section 243(h) of the Immigration and Nationality Act of 1952*, 62 Yale L.J. 845, 846 (1953) (quoting Immigration and Nationality Act of 1952, ch. 477, § 243(h), 66 Stat. 163, 214).

8 U.S.C. § 1231(b)(3)(A) (emphasis added).  Also, the ordinary meaning of "decision" when applied to government agencies is a "determination after consideration of the facts and the law." *See Decision*, Black's Law Dictionary (12th ed. 2024).  Here, the relevant facts include the circumstances that would create a risk to Dia himself if he is removed to Ghana, and it is not possible to assess those facts without his participation.  *See D.V.D.*, 2026 WL 521557, at *27. Accordingly, the statute contemplates an individualized determination about risks specific to Dia, not a general assessment of the risk of persecution or torture for noncitizens as a group.  Thus, the assessment contemplated by the March Guidance is not the decision DHS must make under § 1231.  Instead, DHS must consider Dia's circumstances, after giving him an opportunity to present them.

The larger statutory scheme also tends to refute the government's view.  There are "countless statutory and regulatory provisions providing for notice and a hearing" during removal proceedings, *D.V.D.*, 145 S. Ct. at 2161 (Sotomayor, J., dissenting from unexplained order granting temporary stay), including notice of the country to which the noncitizen will be removed, *see* 8 C.F.R. § 1240.10(f) (in removal hearing, requiring the immigration judge to "identify for the record a country, or countries in the alternative, to which the alien's removal may be made").  These provisions would be meaningless if the government could simply designate one location in its removal order and then deport the noncitizen to a different country "of the Government's choosing" after that removal order becomes final.  *D.V.D.*, 145 S. Ct. at 2161.

Furthermore, the INA contemplates a particular process for DHS to decide whether a country of removal threatens the noncitizen's life or freedom, and that process involves input from the noncitizen.  *See* 8 U.S.C. § 1231(b)(3)(C) (discussing the noncitizen's "burden of proof" to be considered by a "trier of fact" when determining whether the noncitizen's life or freedom would

be threatened by removal to a particular country).  It makes little sense for DHS to provide one type of process before the removal order becomes final and a completely different process (or no process at all) afterward.  Nothing in the statute permits such a result.[7]

A final consideration is the doctrine of avoidance.  The argument that § 1231 requires nothing in the way of process for third-country removals raises serious questions about its constitutionality.  When there is more than one plausible construction of a statute, federal courts generally select the one that avoids rendering the statute unconstitutional.  *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).[8] For reasons discussed in more detail below, the Due Process Clause of the Fifth Amendment requires the government to provide Dia with an opportunity to be heard on whether his removal to Ghana threatens his life or freedom.  If the Court were to conclude that § 1231 does not require such a process, that conclusion would suggest that the statute is unconstitutional.

Accordingly, for all the foregoing reasons, the Court finds that the INA mandates that Dia be given an opportunity to raise fear-based claims regarding his removal to Ghana and to have those claims evaluated in an individualized manner.  In other words, he is entitled to the process he would have received during his removal proceedings had Ghana been designated as a country of removal in those proceedings.

*Due process*.  Even if § 1231 itself does not entitle Dia to the relief he seeks, the Court finds in the alternative that his removal under the March Guidance would deprive him of due process.  This conclusion relies on the statutory and regulatory provisions discussed above for a

---

[7] The entire list of countries to which the government can remove a noncitizen, *see* 8 U.S.C. § 1231(b)(1)–(2), is expressly "[s]ubject to paragraph (3)."  *See* 8 U.S.C. § 1231(b)(1), (b)(2).  Paragraph (3) includes *both* the prohibition in § 1231(b)(3)(A) on removal to countries where the noncitizen's life or freedom would be threatened, *and* the procedural requirements in § 1231(b)(3)(C).

[8] *See* Adrian Vermeule, *Saving Constructions*, 85 Geo. L.J. 1945, 1949 (1997) (distinguishing between "classical" and "modern" avoidance).

different purpose: because those provisions establish Dia's right not to be sent to a country where he will be persecuted or tortured, he can only be deprived of that right through procedures that give him a reasonable opportunity to prove that his persecution or torture is likely.  Dia contends that the procedures set out in the March Guidance do not meet this standard.

"Procedural due process applies only to the deprivation of constitutionally protected liberty or property interests." *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir. 1983).  If a protected interest is established, assessing whether a deprivation of that interest by a given proceeding would comport with due process entails balancing three factors: the private interest at stake in the proceeding; the risk that the interest will be erroneously infringed on by the existing procedures, in light of the opportunities available for mitigating that risk by imposing additional safeguards; and the costs, financial and otherwise, to the government of modifying the existing procedures.  *See Johnson v. Morales*, 946 F.3d 911, 922 (6th Cir. 2020) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The liberty interest Dia invokes is the right not to be removed to a third country without being given the opportunity to raise fear-based claims related to that country.  That interest in no way turns on a favorable exercise of discretion; § 1231, the CAT, and the regulations implementing them prohibit DHS from removing a noncitizen to a country if the agency concludes the noncitizen would be tortured or persecuted there.  *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, No. 25-5243, 2026 WL 1110616, at *19–20 (D.C. Cir. Apr. 24, 2026) (concluding that no statute permits removal to the countries barred by § 1231(b)(3)(A) and the CAT); *Khouzam v. Att'y Gen. of U.S.*, 549 F.3d 235, 255–57 (3d Cir. 2008); *Sagastizado v. Noem*, 802 F. Supp. 3d 992, 1009 (S.D. Tex. 2025) ("[T]hird-country removals are subject to the same mandatory protections that exist in removal or withholding-only proceedings.").  Moreover, the government

does not assert that Dia lacks an interest in not being removed without an opportunity to be heard. "Noncitizens who have 'passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.'" *Lopez-Campos v. Raycraft*, No. 25-1965, 2026 WL 1283891, at *11 (6th Cir. May 11, 2026) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). The Court proceeds to balancing the factors.

The interest Dia invokes is undoubtedly a weighty one.  Extended discussion of the importance of receiving a fair opportunity to express fear of torture or persecution is unnecessary. This factor favors Dia.

The risk that Dia will be improperly deprived of this interest is palpable.  The March Guidance offers essentially no process for noncitizens to raise fear-based claims if DHS plans to remove them to a country from which the government has received assurances that those expelled to its territory will not be persecuted or tortured.  The guidance expressly allows DHS to "remove" noncitizens "without the need for further procedures" if the State Department finds the assurances of the receiving country credible.  (March Guidance 2.)  It is not evident that DHS will even allow Dia to undergo the "screening" that it conducts for those to be removed to countries that have not offered assurances.  And even if it did, the guidance provides no means of obtaining review of a negative determination by the screening officer.  Only a finding of legitimate fear would entitle Dia to a full-dress hearing before an immigration judge—the process he could have received had Ghana been designated as a country of removal during his removal proceedings.  As discussed above, generalized assurances from another country that noncitizens removed to that country will not be tortured or persecuted are not adequate to determine whether Dia himself would be at risk. *See D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2026 WL 521557, at *35–

36 (D. Mass. Feb. 25, 2026).  Neither is the expectation that noncitizens like Dia preemptively seek withholding from countries not mentioned during their removal proceedings, or that they attempt to reopen those proceedings where, as here, it appears they would be barred from doing so.  In these circumstances, *any* additional process allowing Dia to submit his claims to a neutral adjudicator would significantly reduce the risk of an erroneous deprivation of his rights.  This factor also weighs in Dia's favor.

The government's interest in the efficient enforcement of the immigration laws, as important as it is, cannot justify its refusal to entertain a claim that Dia would face a risk or persecution or torture if sent to Ghana.  Indeed, the government already provides a procedure for noncitizens to raise such claims during their removal proceedings, and presumably the government would have offered that procedure to Dia during his own removal proceedings had he raised the issue at that time.  Consequently, requiring the government to provide such a process to Dia at this point will not impose an undue burden on the government.  Thus, all the factors weigh in Dia's favor.  He is likely to succeed on the merits of his due process claim.

In summary, Dia has established a likelihood of success on the merits sufficiently strong to warrant the entry of preliminary injunctive relief.  And because the Court finds no reason to revisit its conclusion that Dia has satisfied the other preliminary-injunction factors, a preliminary injunction will enter.

**D.      Remedy**

Dia's likelihood of success does not necessarily dictate the process that he is entitled to at this stage of the proceedings.  The Court is mindful that enforcement of the immigration laws, including the development of procedures for allowing noncitizens to seek relief from removal, is a matter that Congress has delegated to the executive branch.  But in light of the Court's conclusion that the process provided in the March Guidance is inconsistent with both the INA and the Due

Process Clause, the Court will enjoin Dia's removal until the government offers him a process that *is* consistent with the INA and the Due Process Clause.  Specifically, the government must permit Dia to reopen his removal proceedings so that he can raise any fear-based challenges to his removal to Ghana and have those issues decided by an immigration judge in the same manner as if Dia had challenged his removal to Ghana in his prior proceedings.  *See Navarro-Maury v. Hermosillo*, No. 2:26-CV-00333-TMC, 2026 WL 1413166, at *6 (W.D. Wash. May 20, 2026) (granting similar relief); *Betancourt v. Mullin*, No. 26-CV-2640 JAO (MSB), 2026 WL 1400627, at *5 (S.D. Cal. May 19, 2026) (same); *Larose v. Blanche*, No. 2:26-CV-00423-JAD-NJK, 2026 WL 1346636, at *8–9 (D. Nev. May 14, 2026) (same); *Romero v. Ladwig*, No. CV 25-1106-JWD-EWD, 2026 WL 1146824, at *16 (M.D. La. Apr. 21, 2026) (same); *Mendoza Palacios v. Mullin*, No. 26-CV-648-ABA, 2026 WL 933319, at *11 (D. Md. Apr. 7, 2026) (same); *Aden v. Nielsen*, 409 F. Supp. 3d 998, 1023 (W.D. Wash. 2019) (same); *see also Sagastizado*, 802 F. Supp. 3d at 1016 (enjoining the petitioner's removal to a third country until an immigration judge reviews the petitioner's fear-based claim).

## IV.    CONCLUSION

For the reasons herein, the Court will convert the TRO to a preliminary injunction.  A separate order will issue.

Dated: May 27, 2026                               /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE